## Tufts v. Tufts.

March 26, 1948.

A. N. Cisco for appellant.

L. D. Bruce for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SIMS—Reversing.

The sole question for determination upon this appeal is which of the divorced parents of Kenneth Tufts, 7 years of age, should have custody of him. After hearing considerable proof the chancellor gave the custody of the child to the father, and the mother appeals.

The parents were married on Dec. 24, 1938, and separated in January, 1946. At the time of their separation the father was 28 years of age and was a signalman

for the C .& O. Railroad Company earning $200 per month; the mother was 24 years of age and Kenneth is their only child. The couple lived in a house owned by the husband located in Wurtland in Greenup County, not many miles from Ashland.

On Jan. 24, 1947, Mrs. Tufts sued for divorce upon the ground of cruel and inhuman treatment. In addition to an absolute divorce, she asked the custody of Kenneth, then 6 years of age, a reasonable monthly allowance for his support; the possession of her household and kitchen furniture; a reasonable attorney's fee; but she sought no alimony.

The husband filed no answer but on Jan. 25th, the day following the institution of the action, he entered into a written agreement with his wife to pay her $50 a month for the support of the child and she was given all the household effects for her and the child's use. A judgment was entered on Feb. 7, 1947, in conformity with this agreement after the wife testified that her husband earned $200 per month; accused her of having improper relations with other men; was jealous of his brother-in-law because she asked him to help move some furniture after her husband had refused to assist her in so doing; that on one occasion he struck her; and the husband was a member of Jehovah's Witnesses and did not believe in Christmas.

It appears from the record that after the divorce was granted on Feb. 7th, this couple and their child continued to occupy the house in Wurtland owned by the husband in which was the wife's furniture. They continued to live in this home until May 2nd, 1947, when a disagreement arose and the wife left in the night and went to Ashland where she and the child have occupied a room over a secondhand store on Greenup Avenue.

There is a conflict in the evidence concerning the disagreement of the parties on May 2nd. The husband testified the wife returned home that night "mussed up" and said she had been with Mr. Pemberton. He told her, "If you are going to stay with him you had better get your clothes and stay." Her version of this occurrence is that she had been to a picture show that night in Ashland and returned by bus at 9:40 P. M. When she got home her husband was mad and said to

her, "You damn big son-of-a-bitch you are not staying in the house, I want you to get your furniture out of here tomorrow," grabbed her by the feet, pulled her off a divan, across the floor and kicked her out of the door and threatened to kill her. She immediately went to the State Police, who informed her they had no jurisdiction in such cases. She next went to Esquire Meenach to see if he could help her, after which she went to Ashland and spent the night with a friend, Sallie Pemberton. Mrs. Pemberton testified that appellant came to her house crying around midnight and she saw bruises and scratches on her body.

Soon after this occurrence appellee, upon notice to appellant, filed motion to reopen the case on account of changed conditions to obtain the custody of the child and to cancel the allowance of $50 per month for his support. By agreement his motion was controverted of record, whereupon the chancellor heard considerable evidence.

The father of the child introduced proof to the effect that the small apartment where the mother was living in Ashland was over what he termed a "junkshop"; that it was in an undesirable part of town where Negroes and whites mingled; and that R. A. Pemberton, the man over whom they had the trouble on May 2nd, occupied an apartment in this same building. He further presented evidence that the mother not only cursed in the presence of the child, but cursed the child. That on one occasion when two women, Mrs. Maggard and Mrs. McCloud, in a store asked her if she had taken sewing lessons, appellant replied, "No. If you folks hear of a funeral you will know I have killed Kenneth. * * * I will kill him before I will raise him." One of these women gave this remark as, "I can't raise him, I'll have to kill him." Although she testified Mrs. Tufts' reputation was bad for morals, the witness admitted she could not make up her mind as to whether Mrs. Tufts was serious when speaking of killing the child.

Mrs. Tufts' testimony was that at times she would become exasperated and swear in the presence of the child but never at him; that she did not recall making the statements attributed to her by Mrs. Maggard and

Mrs. McCloud. She intimated that if she made such a statement it was in fun, as she loved the child dearly and has never mistreated him. Appellant and several of her witnesses testified that the father would curse in the presence of the child and that the paternal grandfather in whose home the child would live if the custody were granted the father had the habit of using profane language. However, the grandfather stated he had "gotten religion" and stopped swearing several years ago.

The evidence further shows that this child suffered an injury at birth which resulted in a partial loss of control of his kidneys and bowels and that he, his clothes and bedding needed much washing. The mother has always kept the child and his clothing, clean and neat. She regularly took him to school when living in Wurtland, but the term was so near finished when she moved to Ashland she did not enter him in school there. Two of her sisters, one of whom is a school teacher, say that Mrs. Tufts is the proper person to have the custody of this afflicted child. But their father, Fred Elkins, testified he thought the home of the husband was the best place for the child. However, he gave no reason for this statement.

The grandparents live in the country on a dirt road about a mile and a quarter from the school at Wurtland. They are willing to take this child and care for him. During the war while the father was in the armed forces and the mother worked in a defense plant, these grandparents kept Kenneth for 18 months. The grandmother is 52 years of age, admits to having a heart condition and says two of her older brothers, her husband and appellee are members of her household, which includes no children. She says that she can and will care for the child if its custody is given to her son.

We do not regard the Tufts home as a salutary place for this child. The grandfather belongs to that religious sect which believes saluting the flag of our country is sacrilegious. It is admitted by him, as well as by his son, that Negroes have stayed overnight in the grandparent's home. It is true that a small apartment or room over a secondhand store which appellant occupies on Greenup Avenue in Ashland is not a desirable

place for this young and semi-afflicted son, yet we believe that in view of all the circumstances the child will fare there better than in the home of his grandparents.

The agreement between the parents respecting the custody of their child will be given consideration, but it is not binding on courts. Gribben v. Gribben, 227 Ky. 96, 11 S. W. 2d 998. The paramount consideration in determining which parent shall have custody of a child of tender age, is the welfare and proper rearing of the child. Sowders v. Sowders, 286 Ky. 269, 150 S. W. 2d 903. Generally, the mother rather than the father is given the custody of such child by courts unless it is shown she is unsuited morally to have the control of children, or is so situated that she is unable to give the care, attention and love which young children require. Travis v. Travis, 282 Ky. 215, 138 S. W. 2d 336; Clark v. Clark, 298 Ky. 18, 181 S. W. 2d 397. It strikes us that this rule is especially applicable where the child is semi-afflicted, as is this little boy, Kenneth. Day·v. Day, 213 Ky. 562, 281 S. W. 493.

Cases of this character are perhaps the most difficult with which courts must deal. The law is plain, but the facts are what give us such grave concern. Of necessity, each case must stand upon its own peculiar state of facts and precedents are of no great value. Slusher v. Slusher, 298 Ky. 400, 182 S. W. 2d 972.

In the present instance we can see no change in conditions which justify the taking of this child from its mother and putting it in the home in the country where only old people dwell. This home is located on a dirt road over a mile from school. When the father agreed for the mother to have the custody of this child, he was in possession of all the facts concerning her character that he now knows. She had the right to go with Pemberton, as each was divorced. We believe the wife's home, as cramped as it is, offers a better opportunity for Kenneth than does the home of his father. However, we might say in passing that the future of this child in either home does not look bright and his happiness and welfare, perhaps, would be promoted if he were placed in a children's home.

The judgment is reversed with directions that one be entered restoring the custody of Kenneth to his

mother and allowing his father to visit him at such reasonable times and places as the chancellor may think proper. The judgment should further provide that the father pay the mother $50 per month for the maintenance of his son.

The judgment is reversed.